# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF FLORIDA
# ORLANDO DIVISION

UNITED STATES OF AMERICA and
ARCHITECTURAL COATINGS, INC.,

        Plaintiffs,

v.                                             Case No: 6:17-cv-1984-Orl-40TBS

TRAVELERS CASUALTY AND
SURETY COMPANY,

        Defendant.
_____/

## **ORDER**

This cause comes before the Court on the following:

1. Defendant Travelers' Motion for Partial Summary Judgment (Doc. 34), filed September 4, 2018; and

2. Plaintiff's Memorandum in Opposition to Travelers' Motion for Partial Summary Judgment (Doc. 39), filed October 3, 2018.

Upon consideration and review of the record as cited by the parties in their respective briefs, Defendant Travelers' Motion for Partial Summary Judgment (Doc. 34) is due to be granted in part and denied in part.

## I.    BACKGROUND

This case arises out of an allegedly unpaid claim for work performed by subcontractor Architectural Coating, Inc. ("**ACI**") at NASA/John F. Kennedy Space Center for the Government for which Hensel Phelps Construction Co. ("**Hensel Phelps**") served as the prime contractor. ACI filed suit against Hensel Phelps' surety, Travelers Casualty and Surety Company ("**Travelers**"), pursuant to the Miller Act, 40 U.S.C. § 3131, which

provides a subcontractor who has supplied labor or materials on a federal government construction project—but has not been paid—with the right to sue the surety who provided the primary contractor with the statutorily required payment bond.

### A. Factual Background[1]

On March 5, 2014, Hensel Phelps entered into General Contract No. NNK14EA35C (the "**Prime Contract**") with the Government to perform all work required to modify and improve the Vehicle Assembly Building High Bay 3 for Space Launch System (the "**Project**"), located at the John F. Kennedy Space Center. (Docs. 1, ¶ 6; 34, ¶ 1). On March 6, 2014, Hensel Phelps, as principal, and Travelers, as surety, executed and delivered a payment bond (the "**Bond**") to the Government, pursuant to the Miller Act, 40 U.S.C. § 3131. (Docs. 1, ¶ 7; 34 ¶ 2). On March 13, 2015, the Government issued a unilateral contract action pursuant to FAR 43.103(B) and 52.243-4 and NASA FAR Supplement 1843.70 for TN-43, TD-07, Design – Replace Accessways with Egress Ramps. (Doc 34-2 ("**Modification 15**")). Modification 15 had a "Not to Exceed Value" of $7,180,252.00 and required the contractor to "track costs incurred for this action separately from other contract costs." (*Id.*).

On July 6, 2015, ACI contracted with Hensel Phelps to furnish all materials and to perform all work necessary to complete a portion of the Project. (Doc. 1-2 (the "**Subcontract**")). ACI's scope of work was limited to fireproofing work added to the Prime Contract as part of Modification 15. (Doc. 37, ¶ 8).

ACI alleges that it has satisfactorily performed all required work and furnished the required services, materials, and supplies, and that they have been accepted by Hensel

---

[1] The facts are adopted from the parties' joint Statement of Undisputed Facts (Doc. 48).

Phelps and the Government. (Doc. 1, ¶ 9). However, ACI asserts that there remains due the sum of $376,609.00 from the full Subcontract amount of $646,886.00. (*Id.* ¶ 10). ACI's sole claim is against the Bond posted by Hensel Phelps and delivered to the Government pursuant to the Miller Act. (*Id.* ¶ 11). Accordingly, ACI claims that Travelers, as surety, is obligated to pay according to the terms of the Bond for monies owed under the Subcontract. (*Id.*).

Travelers requests partial summary judgment in its favor on the basis that: "1) the Subcontract between Travelers and ACI was subject to auditing, adjustment, and change pursuant to an Undefinitized Contract Action; and 2) the amounts due under a payment bond are defined by the terms of the Subcontract—which limits ACI's recovery in this action." (Doc. 34, p. 1). Therefore, Travelers argues that ACI cannot make a claim based on the un-audited Subcontract amount of $646,886.00. (*Id.*).

In support of its motion, Travelers seeks review of the following documents: (1) the Subcontract (Doc. 1-2); (2) the Prime Contract (Doc. 34-1); and (3) Modification No. 15 (Doc. 34-2). Travelers cites the following provisions from the aforementioned documents:

> **Subcontract Provisions**
>
> **Section A**. The Subcontractor covenants, promises and agrees to furnish all material and personal property and to diligently and fully perform all work hereinafter described . . . in strict accordance with Contract NNK14EA35C between the Contractor and the Owner entered into March 5, 2014 and hereby made a part of this Subcontract by reference. (Doc. 1-2, p. 2, § A).
>
> . . . .
>
> **Section B**. The Subcontractor agrees to . . . furnish and install all fireproofing work as required by Contract NNK14EA35C dated March 5, 2014 . . . Additionally, all RFI's and approved TN's prior to March 26, 2015 are incorporated into the work of this contract. (Doc. 1-2, p. 2, § B).

. . . .

**Section C**. The Contractor agrees to pay the Subcontractor for the full, faithful and complete performance of this Subcontract the sum of **Six Hundred Forty-Six Thousand Eight Hundred Eighty-Six and No/100** Dollars **($646,886)**, *subject to additions and deductions for changes agreed upon in writing as hereinafter set forth or as otherwise authorized hereinafter*; and Contractor further agrees to make all partial and final payments on account thereof *in accordance with the terms and provisions of the Subcontract Documents including, but without restriction thereto, the provisions of Section D, Article 5 of this Subcontract*. (Doc. 1-2, p. 2B, § C) (emphasis added).

. . . .

**Section D. General Provisions.**
**Article 1 - Definitions**
(b)     The term "Contract Documents" as used herein refers to the "Contract" between the Owner and the Contractor, together with all plans, drawings and specifications, including the General Conditions, Supplemental General Conditions, and Special Conditions, Addenda, Amendments, and/or instruments of like effect issued by or on behalf of the Owner as a part of the Contract; together with any and all other documents or instruments referred to or incorporated in the aforesaid "Contract" and "Contract Documents" and/or as identified by the Owner's Authorized Agent. (Doc. 1-2, p. 3, § D (1)(b)).

. . . .

**Article 2 – Compliance with Contract Documents.**
(a)     The Contract Documents, as defined in the Contract, are hereby incorporated by reference.  Subcontractor will not do, or fail to do, any act relating to Subcontractor's work, if by reason of such act or failure to act, Contractor would be in breach of or fail to comply with the Contract Documents. (Doc. 1-2, p. 3, § D(2)(a)).

. . . .

**Article 5 – Payment.**
(c)     When requested by the Contractor to do so, the Subcontractor shall, within (30) days of the date hereof or at least thirty (30) days prior to its first application for payment hereunder, submit to the Contractor a complete and accurate schedule of various parts of the

Subcontractor's work aggregating the total sum of this Subcontract, ***itemized and detailed*** as required by the Contractor and supported by such evidence as to its correctness as the Contractor may direct. This schedule, when approved by the Contractor, shall be used as the basis for making payments unless it is found to be in error or in conflict with the procedures or determinations of the Owner or its representative regarding partial payments by the Contractor. (Doc. 1-2, p. 3, § D(5)(c)) (emphasis added).

. . . .

(d)   No partial payment or certificate therefor shall constitute acceptance or approval of the Contractor of the work or material for which the partial payment is made.  No partial payment shall constitute a waiver by the Contractor of any right to require fulfillment of all terms of the Subcontract Documents.  Neither the final payment nor any partial payment, nor any certificate for either shall constitute acceptance by the Contractor of defective work or improper materials or of any element of Subcontractor's performance determined to be at variance with the Subcontract Documents. Each partial payment and the final payment made hereunder, and the total thereof, will be ***subject to final audit and adjustment,*** and the Subcontractor hereby agrees to reimburse the Contractor in the event of overpayment, together with any costs and expenses, including attorneys' fees, the Contractor may incur in securing recovery thereof. (Doc. 1-2, p. 3, § D(5)(d)) (emphasis added).

. . . .

**Article 16 – Changes.**  Contractor may at any time, by written order and without notice to surety, make changes in the work called for herein and Subcontractor shall proceed with the work as directed.  ***If said changes cause an increase or decrease in the cost of performance or in the time required for performance, an equitable adjustment shall be made and this Subcontract shall be modified in writing accordingly.***  (Doc. 1-2, p. 3, § D(16)) (emphasis added).

. . . .

**Exhibit 19A - #3.**   The Prime Contract includes reference to specific Federal Acquisitions (FAR) Clauses, including variations such as AFARS and NFS if referenced. . . . The referenced FAR Clauses are requirements of this Subcontract Agreement. (Doc. 1-2, Exhibit 19A(3)).

5

**Prime Contract Provisions**

**FAR[2] 52.232-5**: Limitation because of undefinitized work. Notwithstanding any provision of this contract, progress payments shall not exceed 80 percent on work accomplished on undefinitized contract actions. A "contract action" is any action resulting in a contract, as defined in FAR Subpart 2.1, including contract modifications for additional supplies or services, but not including contract modifications that are within the scope and under the terms of the contract, such as contract modifications, issues pursuant to the Changes clause, or funding and other administrative changes. 48 C.F.R. 52.232-5.

**FAR 52.243-4**: The Contracting Officer may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes [to] specifications [and] the method or manner of performance of the work. 48 C.F.R. 52.243-4(a)(1)-(2). If any change under this clause causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract, whether or not changed by any such order, the Contracting Officer shall make an equitable adjustment and modify the contract in writing. 48 C.F.R. 52.243-4(d).

**Modification No. 15 Provision**

The contractor is hereby directed to proceed with all work associated with TN-43, TD-07 Design—Replace Accessways with Egress Ramps. The Not to Exceed value is $7,180,252. ***The Contractor shall track costs incurred for this action separately from other contract costs***. (Doc. 34-2, § 14) (emphasis added).

**B.** **The Miller Act**

The Miller Act requires any general contractor awarded a government contract for more than $100,000 to secure two bonds, a performance bond to protect the government, and a payment bond "for the protection of all persons supplying labor and material in

---

[2] FAR stands for "Federal Acquisition Regulations." The complete text of all FAR Clauses is available at http://www.arnet.gov/far/. The FAR Clauses also appear in Title 48 of the Code of Federal Regulations.

carrying out the work provided for in the contract." 40 U.S.C. § 3131(b). The purpose of the Act is to ensure payment to subcontractors that the prime contractor fails to pay. Entities providing labor or material on a project for which a payment bond was issued may bring a civil action in federal court[3] to recover unpaid amounts within ninety days of completing its work and may collect judgment on the bond for the amount due. 40 U.S.C. § 3133; *United States ex rel. McKenney's Inc. v. Gov't Tech. Servs., LLC*, 531 F. Supp. 2d 1375 (N.D. Ga. 2008).

A plaintiff must prove four elements to collect under the Miller Act: 1) that materials were supplied for work in the particular contract at issue; 2) the supplier is unpaid; 3) the supplier had a good faith belief that the materials were for the specified work; and 4) the jurisdictional requisites are met. *United States ex. rel. W.W. Gay Mech. Constr., Inc. v. Walbridge Aldinger Co.*, 543 Fed. App'x. 937 (11th Cir. 2013).[4]

The Miller Act, remedial in nature, is "entitled to a liberal construction and application . . . in order to properly effectuate the Congressional intent to protect those whose labor and materials go into public projects." *J.W. Bateson Co. v. U.S. ex rel. Bd. of Trs.*, 434 U.S. 586, 594 (1978); *United States ex rel. Carlson v. Cont'l Cas. Co.*, 414 F.2d 431 (5th Cir. 1969).

## II. STANDARD OF REVIEW

---

[3] The Miller Act requires that such suits be brought "in the name of the United States for the use of the person bringing the action." 40 U.S.C. § 3133(b)(3)(A).

[4] "Unpublished opinions are not controlling authority and are persuasive only insofar as their legal analysis warrants." *Bonilla v. Baker Concrete Const., Inc.*, 487 F.3d 1340, 1345 (11th Cir. 2007).

A court may only "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the initial burden of "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" to support its position that it is entitled to summary judgment. Fed. R. Civ. P. 56(c)(1)(A). "The burden then shifts to the non-moving party, who must go beyond the pleadings, and present affirmative evidence to show that a genuine issue of material fact exists." *Porter v. Ray*, 461 F.3d 1315, 1320 (11th Cir. 2006). "The court need consider only the cited materials" when resolving a motion for summary judgment. Fed. R. Civ. P. 56(c)(3); *see also HRCC, LTD v. Hard Rock Café Int'l (USA), Inc.*, 703 F. App'x 814, 816–17 (11th Cir. 2017) (per curiam) (holding that a district court does not err by limiting its review to the evidence cited by the parties in their summary judgment briefs).

An issue of fact is "genuine" only if "a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In determining whether a genuine dispute of material fact exists, the Court must read the evidence and draw all factual inferences therefrom in the light most favorable to the non-moving party and must resolve any reasonable doubts in the non-movant's favor. *Skop v. City of Atlanta, Ga.*, 485 F.3d 1130, 1136 (11th Cir. 2007). Summary judgment should only be granted "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

Contract interpretation presents questions of law appropriate for summary judgment. *Saregama India Ltd. V. Mosley*, 635 F.3d 1284, 1290 (11th Cir. 2011); *see also Keybank Nat'l Ass'n v. Willoughby*, No. 2:09-cv-662, 2010 WL 3212086, at *3 (M.D. Fla. Aug. 12, 2010). "In a case involving contract interpretation, summary judgment is appropriate 'when the agreement is totally unambiguous, or when any ambiguity may be resolved by applying the rules of construction to situations in which the parol evidence of the parties' intentions is undisputed or non-existent.'" *Dew Seven, LLC v. Big Lots Stores, Inc.*, 354 Fed. App'x 415, 416 (11th Cir. 2009) (per curiam).

## III.   DISCUSSION

Travelers argues that the Subcontract was never a fixed-price contract but rather always subject to definitization, adjustment, and audit. (Doc. 34, p. 9). Specifically, Travelers moves for the Court to find that the amounts due and owing to ACI are subject to the provisions regarding modification/change appearing in: (1) the Subcontract (Doc. 1-2); (2) the Prime Contract (Doc. 34-1); and (3) Modification No. 15 (Doc. 34-2). Accordingly, Travelers contends that ACI cannot make a claim against Travelers based on the un-audited $646,886.00 Subcontract amount. (Doc. 34, p. 1).

### A.   Subcontract Terms

Travelers argues the terms of the Subcontract provide that the payment amount was subject to definitization, adjustment, and audit. (Doc. 34, p. 8). First, Travelers cites Section C of the Subcontract, which states the Contractor agrees to pay the Subcontractor the amount of $646,886.00 "subject to additions and deductions for changes agreed upon in writing as hereinafter set forth or as otherwise authorized hereinafter . . . and agrees to make all partial and final payments . . . in accordance with

the terms and provisions of the Subcontract Documents including . . . the provisions of Section D, Article 5." (*Id.*; Doc 1-2, p. 2B). Section D, Article 5 sets forth payment procedures and includes the following provisions: (1) "[w]hen requested by the Contractor to do so, the Subcontractor shall . . . submit to the Contractor a complete and accurate schedule of values of the various parts of the Subcontractor's work aggregating the total sum of this Subcontract, *itemized and detailed*," (Doc. 1-2, § C(5)(c)) (emphasis added); and (2) "[e]ach partial payment, and the final payment made hereunder, and the total thereof, will be *subject to final audit and adjustment.*" (Doc. 1-2, § C(5)(d)) (emphasis added)). Second, Travelers cites Section C, Article 16 which permits the Contractor to make changes at any time by written order and to adjust the cost of performance accordingly. (Doc. 34, p. 8; Doc. 1-2, § C(16)). Therefore, Travelers—standing in the shoes of Hensel Phelps as surety—asks the Court to find that the amounts due and owing to ACI are subject to the foregoing clauses regarding audits and changes to the Subcontract amount.

In response, ACI avers that the Subcontract was a lump sum, fixed-price contract whereby ACI would be paid a total amount of $646,886.00 for its work on the Project. (Doc. 39, ¶ 8). First, ACI states that the Subcontract did not contain any unit pricing or line-item prices; it only listed the amount of $646,886.00, which establishes it is a lump sum contract. (*Id.* ¶ 9). Second, ACI asserts that there were no changes in the scope of work to justify changes to the Subcontract amount, and ACI did not agree to any such changes. (*Id.* at p. 10). Third, ACI contends that the parties "intended and have consistently acknowledged that the [S]ubcontract was a lump sum contract" and cites to communication between the parties as evidence of this intent. (*Id.* at p. 9–10).

The Court finds that the Subcontract contains unambiguous language which shows the Subcontract payment amount was subject to definitization, adjustment, and audit, rather than being a fixed-price amount. "[W]hen construing a contract, a court should look to the whole contract." *In re Yates Dev., Inc. v. Old Kings Interchange, Inc.*, 256 F.3d 1285, 1290 (11th Cir. 2001). Under general principles of contract interpretation, "a document should be read to give effect to all its provisions and to render them consistent with each other." *In re FFS Data, Inc.*, 776 F.3d 1299, 1305 (11th Cir. 2015). ACI argues the Subcontract was a lump sum, fixed-price contract for $646,886.00 because the Subcontract lists the amount of $646,886.00 without including unit pricing or line-item prices. (Doc. 39, ¶ 9). However, the Court cannot look to the $646,886.00 in isolation. Instead, the Court must "look at the whole contract," including the provisions regarding changes, audits, and final adjustments. *See In re Yates*, 256 F.3d at 1290; (Doc. 1-2, § C(5)(c)–(d)). Section C of the Subcontract explicitly states the $646,866.00 payment is "subject to additions and deductions . . . in accordance with . . . the provisions of Section D, Article 5." (*Id.* at p. 2B). Section D, Article 5 mandates that each payment "will be subject to final audit and adjustment" and requires ACI to submit an "itemized and detailed" schedule of values for payment when requested by the Contractor. (*Id.* § C(5)(c)–(d)). Similarly, Section C, Article 16 permits the Contractor to modify the scope of work and to adjust performance accordingly. (*Id.* § C(16)). Reading these provisions of the Subcontract together, the Court finds that the plain language clearly and unambiguously subjects the $646,886.00 payment amount to definitization, adjustment, and audit.

ACI's second argument presents questions of fact relating to whether there were any changes to the scope of work and if so, whether those change were agreed to in writing. (Doc. 39, p. 10). However, the Motion for Partial Summary Judgment is on the narrow issue of whether the amounts allegedly due and owing to ACI are subject to the contract clauses regarding modification and/or change to the Subcontract amount. (Doc. 34, p. 9). Therefore, the Court will not address ACI's second argument.

ACI's third argument regarding intent relies solely on communications outside the Subcontract, such as emails and letters between the parties. (Doc. 39, p. 10). "While it is hornbook contract law that a court 'may rely on parol evidence to explain or clarify an ambiguity' in a contract, where the essential terms of a contract are unambiguous the court 'will not look beyond the four corners of the document to determine the parties' intent.'" *Ellinger v. United States*, 470 F.3d 1325, 1338 (11th Cir. 2006). Accordingly, given the unambiguous terms regarding auditing and changes, the Court will not consider ACI's third argument. (Doc. 39, ¶ 9–10).

### B. Prime Contract and Modification 15 Terms

Travelers contends that the Subcontract incorporated the Prime Contract and any addenda, and specifically requests the Court determine that the Subcontract incorporated by reference FAR 52.232-5, FAR 52.243-4, and Modification 15. (Doc. 34, p. 6). Travelers avers that the Government invoked its rights under FAR 52.232-5 and FAR 52.243-4 to unilaterally issue Modification 15—an undefinitized contract action[5]—which required the

---

[5] "Undefinitized contract action" means a unilateral or bilateral contract modification or work/task order in which the final price or estimated cost and fee have not been negotiated and mutually agreed to by NASA and the contractor. 48 C.F.R. 1843.7001.

contractor to "track costs incurred for this action." (*Id.*). Notably, as a result of Modification 15, Hensel Phelps entered into the Subcontract with ACI, whereby ACI agreed to furnish and install all fireproofing work required by Modification 15. (Docs. 37-1, ¶ 5; 39, ¶ 3). Therefore, Travelers argues that ACI is bound by Modification 15's requirement that all costs be tracked and definitized. (*Id.*).

The Prime Contract specifically designates FAR 52.232-5 and FAR 52.243-4 as clauses that are "incorporated by reference." (Doc. 34-1, p. 51). FAR 52.243-4 states that the Government "may, at any time, without notice to the sureties, if any, by written order designated or indicated to be a change order, make changes in the work within the general scope of the contract, including changes to" specifications and the method or manner of performance of the work. 48 C.F.R. 52.243-4(d). "If any change under [FAR 52-243-4] causes an increase or decrease in the Contractor's cost of, or the time required for, the performance of any part of the work under this contract . . . the [Government] shall make an equitable adjustment and modify the contract in writing." (*Id.*). FAR 52.232-5 further provides for a limitation to payment for undefinitized work. 48 C.F.R. 52.232-5. Travelers contends that pursuant to these regulations, the Government issued Modification 15–an undefinitized contract action that changed the Prime Contract's, and therefore the Subcontract's payment terms. (Doc. 34, p. 6).

Travelers argues that the Prime Contract, and therefore FAR 52.232-5, FAR 52.243-4, and Modification 15, were incorporated into the Subcontract by the following Subcontract provisions: (1) Section D, Article 2(a) which states that "The Contract Documents, as defined in [Article 1(b)], are hereby incorporated by reference" (Doc. 1-2, p. 3, § D(2)(a)); (2) Section D, Article 1(b) which defines "Contract Documents" as the

13

"'[Prime] Contract' between the [Government] and the Contractor" including addenda, amendments, or instruments issued by the Government as a part of the [Prime] Contract; "together with all other documents referred to or incorporated" in the Prime Contract (Doc. 1-2, p. 3, § D(1)(b)); (3) Exhibit 19A(3) which states that FAR Clauses referenced in the Prime Contract are "requirements of this Subcontract" (Doc. 1-2, Exhibit 19A(3)); (4) Section A which requires ACI to perform all work in strict accordance with the Prime Contract (Doc. 1-2, p. 2, § A); and (5) Section B which states that "all RFI's and approved TN's prior to March 26, 2015 are incorporated into the work of this contract." (Doc. 1-2, p. 2, § B).

In response, ACI argues that the only provisions that can be incorporated by reference are those provisions related to scope, quality, character, and manner of the work. (Doc. 39, p. 7); *see Edward E. Morgan Co. v. United States*, 230 F.2d 896 (5th Cir. 1956).[6] ACI explains that FAR 52.232-5, FAR 52.243-4, and Modification 15 cannot be incorporated by reference because they deal with payment terms. (Doc. 39, p. 7). Further, ACI contends that the general incorporation-by-reference language relied on by Travelers incorporates the Prime Contract for the limited purpose of specifying the work to be performed, and that no other provision or federal regulation was specifically incorporated. (*Id.* at p. 9). Accordingly, ACI argues that FAR 52.232-5, FAR 52.243-4, and Modification 15 are not incorporated into the Subcontract and cannot alleviate Travelers from fulfilling its payment obligations under the Subcontract. (*Id.*).

---

[6] In *Bonner v. City of Prichard*, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), the Eleventh Circuit adopted as binding precedent all decisions of the former Fifth Circuit handed down before October 1, 1981.

14

It is a general principle that public contracts are "strictly construed and nothing is added by implication." *United States v. R.M. Wells Co.*, 497 F. Supp. 541, 544 (11th Cir. 1980). This principle is critical in the context of Miller Act cases given the Act's purpose "to provide security for those who furnish labor and material in the performance of government contracts." *Id.* (quoting *Liebman v. United States*, 153 F.2d (9th Cir. 1946)). "[C]ourts are reluctant to incorporate into the subcontract provisions of the prime contract which adversely affect the Miller Act rights of the subcontractor." *R.M. Wells Co.*, 497 F. Supp. at 544. Courts therefore routinely require an express provision to incorporate specific prime contract terms into a subcontract. *Id.*; *see also H.W. Caldwell & Son, Inc. v. United States*, 407 F.2d 21 (5th Cir. 1969) (administrative remedies in a dispute clause of prime contract held not incorporated into Miller Act subcontract without an express provision to that effect in the subcontract). Incorporation by general reference only incorporates the quality and manner of the subcontractor's work from the prime contract, not the rights and remedies he may have against the prime contractor. *H.W. Caldwell*, 407 F.2d at 23; *see also United States v. Interstate Landscaping Co.*, 37 F.3d 1500 (6th Cir. 1994) ("Historically, courts have viewed incorporation by general reference with skepticism in Miller Act cases. . . . The Miller Act establishes specific statutory rights intended to protect subcontractors, and courts are reluctant to conclude that a subcontractor abandoned those rights absent language of specific incorporation.").

Here, no express provision is made incorporating FAR 52.232-5, FAR 52.243-4, or Modification 15 into the Subcontract. Rather, the Subcontract includes general incorporation-by-reference language that incorporates the Prime Contract in its entirety. (Doc. 1-2, p. 3, § D(2)(a)). Taken together, the above cases instruct that the incorporation-

by-reference provisions incorporate the FAR Clauses and Modification 15 only if they refer to the quality and manner of ACI's work. *See H.W. Caldwell*, 407 F.2d at 23. The Court finds that FAR 52.243-4 and Modification 15 are incorporated, but FAR 52.232-5 is not. FAR 52.243-4 authorizes the Government to "make changes in the work within the general scope of the contract, including changes [to] specifications [and] the *method or manner* of performance of the work." 48 C.F.R. 52.243-4(d) (emphasis added). Modification 15, issued by the Government pursuant to FAR 52.243-4, makes changes to the manner of work by adding the additional project to "Replace Accessways with Egress Ramps." (Doc. 37-1, ¶ 4). The provision within Modification 15 stating that the contractor "shall track costs occurred for this action" is also incorporated because it relates to the manner in which the work was to be completed. However, the Court finds that FAR 52.232-5 is not incorporated because it only discusses "limitation of payment" and bears no relation to the quality or manner of subcontract work. 48 C.F.R. 52.232-5.

## IV. CONCLUSION

Accordingly, it is **ORDERED AND ADJUDGED** that Defendant's Motion for Partial Summary Judgment (Doc. 34) is **GRANTED IN PART** and **DENIED IN PART** as provided herein.

**DONE AND ORDERED** in Orlando, Florida on December 13, 2018.

> PAUL G. BYRON
> UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record
Unrepresented Parties